UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| GJMS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  2:18CV135-PPS |
| | ) |
| HAMSTRA BUILDERS INC., | ) |
| MITCH VAN KLEY, and | ) |
| WILBERT HAMSTRA, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

This matter is spawned from a messy divorce between Greg and Jodi Hamstra. The divorce was finalized in 2016, but that was far from the end of the acrimony between the two. The Hamstras have continued to clash with one another ever since their divorce was finalized, using the courts as their battleground to wreak havoc on one another. (Indeed, a new case emanating from the divorce recently hit my docket. *See* 2:22CV145.) The present case was reassigned to me from Judge Moody after he denied summary judgment. [DE 132.] The first thing I was concerned with, as in all cases, was subject matter jurisdiction. I pondered whether the domestic relations exception to subject matter jurisdiction strips me of jurisdiction. I asked the parties to brief the matter and then I held an oral argument. [DE 138, 152.] Although I have a great deal of doubt about my jurisdiction over one of the claims in this case, given the narrow nature of the domestic relations exception, I do ultimately conclude that I have subject matter jurisdiction over all claims.

## The Nature of the Dispute

For purposes of determining the existence of subject matter jurisdiction, a complaint's allegations are taken as true unless a defendant offers evidence calling jurisdiction into question. *Amling v. Harrow Industries LLC*, 943 F.3d 373, 376 (7th Cir. 2019). I may also "look past the complaint to any pertinent evidence." *Id*.

Let's first identify the parties so that the nature of this dispute can be put into context. Plaintiff GJMS is an Indiana LLC of which Jodi Hamstra is the sole member. [DE 1 at ¶1.] GJMS was and is in the business of acquiring, owning and managing real estate. [*Id*. at ¶6.] GJMS is one of the assets that Jodi received in her divorce from Greg. On the defense side of the case is an entity known as Hamstra Builders Inc. (HBI) whose president is Greg Hamstra, Jodi's ex-husband. [*Id*. at ¶2.] Defendant Mitch Van Kley is a director of HBI, as well as its Executive Vice President and Chief Financial Officer. [*Id*.] Defendant Wilbert Hamstra is Greg's father. [DE 147 at 2.]

GJMS was first organized as an LLC in 2009, pursuant to an Operating Agreement and a First Amendment to the Operating Agreement, both dated and effective December 1, 2009. [DE 1 at ¶6.] The members of GJMS at that time were Wilbert Hamstra, Greg Hamstra and Mitch Van Kley. [DE 105-1 at 1.] A Management Agreement also dated December 1, 2009 named Wilbert as the Manager of GJMS and set out his compensation and the term of the agreement. [DE 105-2.]

Jodi and Greg divorced in 2016. The resolution of the divorce included a Mediated Property Settlement Agreement (MPSA) dated May 20, 2016. [DE 1 at ¶8.] The MPSA contained a provision for Jodi to become the sole member of GJMS:

> All of the membership interests in GJMS, LLC ("GJMS")...will be transferred to Wife by all of the current members, being Husband, Wilbert Hamstra and Mitch Van Kley. Husband shall obtain the agreement of the other members to transfer their interests in GJMS to Wife. Husband agrees to indemnify and hold harmless Wife and GJMS from any management fees payable to Wilbert Hamstra by GJMS after December 31, 2017.

[DE 1-1 at page 2, ¶2(A).] It's not at all clear how exactly Greg was supposed to get Wilbert or Mitch Van Kley's "agreement . . . to transfer their interests in GJMS" to Jodi. What if they balked? Nevertheless, getting their agreement was obviously integral to finalizing the divorce. As things turned out, Greg was able to secure Wilbert and Van Kley's agreement to give up their interests in GJMS, and Jodi became GJMS's sole owner as a result. The Jasper County Superior Court Judge overseeing the divorce proceedings thereafter specifically incorporated the MPSA into the Decree of Dissolution. [DE 147-2.]

GJMS's complaint in this case alleges that in connection with the divorce settlement negotiations in May 2016, Jodi and Van Kley made an oral agreement that Wilbert could continue to be GJMS's "managerial agent" so long as he delegated the duties to Van Kley and HBI through December 31, 2017. [DE 1 at ¶10.] Under this verbal agreement, neither Wilbert, Van Kley or HBI would perform any managerial services for GJMS after January 1, 2018. [*Id.* at ¶11.] GJMS alleges that Jodi and Van Kley further agreed that the managerial fee to be paid to Wilbert by GJMS during the Management

3

Term (that is, through December 31, 2017) would be "GJMS's 'net cash'—that is, GJMS's monies available after deducting expenses from income." [*Id*. at ¶11.]

The complaint states boldly (in both senses of the word) that Greg and Jodi's MPSA contains "**no provisions whatsoever**" for GJMS to pay Wilbert a management fee. [*Id*. at ¶12, emphasis in the original.] This strikes me as odd. The MPSA clearly contemplates payments to Wilbert when it says that the "Husband agrees to indemnify and hold harmless Wife and GJMS from any management fees *payable to Wilbert Hamstra* by GJMS after December 31, 2017." [DE 1-1 at page 2, ¶2A, emphasis added.] This seems to at least imply that prior to the end of 2017, Wilbert would receive management fees with GJMS paying those fees. And thereafter, if Wilbert continued to receive management fees, they would be paid for by Greg. Put another way, what exactly is the point of the indemnification provision if payments to Wilbert weren't being contemplated? And indeed, payments (and more particularly, overpayments) to Wilbert under the oral side agreement are Jodi's theory of this case. So I look askance at Jodi's claim that payments to Wilbert were not contemplated under the MPSA. At the very least, this portion of the MPSA, which was approved by the Dissolution Court and made part of its Dissolution Decree, is ambiguous; someone needs to clarify it. The question is, whose responsibility is it to do the clarifying?

Anyway, according to the complaint, Wilbert's June 4, 2016 assignment of his interest in GJMS included his resignation and removal as the manager of GJMS. [*Id*. at ¶13.] The complaint asserts that the resignation terminated GJMS's preexisting

4

December 1, 2009 Management Agreement as a matter of law. [*Id*. at ¶14.] Nevertheless, accounting documents disclosed in or after December 2017 indicate that Wilbert continued to get paid his monthly fee of $32,700 each month from June 2016 through December 2017. These payments were made despite the fact that, according to the complaint, Wilbert's resignation terminated the Management Agreement that provided for that amount, and Jodi's oral agreement with Van Kley was that Wilbert was to be paid "net cash" each month. [*Id*. at ¶¶15 - 17.] The Complaint further alleges that the defendants used GJMS funds on the maintenance of properties not owned by GJMS, and that they were negligent in the management of GJMS's Rochester property. [*Id.* at ¶¶18, 19.]

Count I of the complaint seeks a declaratory judgment that no monies are owed by GJMS to HBI. This relates to a $201,000 loan HBI claims it made to GJMS in 2017. [*Id*. at ¶¶22, 25.] On this same issue, HBI has filed a counterclaim against GJMS seeking $201,000 in expenses, taxes and insurance premiums that HBI allegedly paid on GJMS's behalf after the MPSA was executed. [DE 15 at 12-13.] Count II of the complaint is a claim against all three defendants (HBI, Wilbert and Van Kley) for theft and/or conversion under Indiana statutes §35-43-4-2 and §35-43-4-3, respectively. [*Id*. at ¶27.] The claim relates to the allegations of overpayments to Wilbert (all in 2016 and 2017) as well as payments they made with GJMS funds for services not provided to GJMS-owned properties. [*Id*. at ¶28.] Finally, Count III of GJMS's complaint is a claim against all the defendants for breach of fiduciary duty. GJMS asserts that all three defendants were

5

agents of GJMS for purposes of management activities and breached their fiduciary duty in relation to several matters, namely the claim of a loan by HBI, overpayments to Wilbert, payment for services not provided to GJMS, and negligence as to the Rochester property. [*Id.* at ¶¶30, 31.]

### The Domestic Relations Exception

Diversity jurisdiction has been thought to apply to this case, given the amount in controversy and the diversity of the parties' state citizenship. The question is whether the domestic relations exception applies to trump the exercise of federal subject matter jurisdiction. More than 30 years ago, the U.S. Supreme Court concluded "that the domestic relations exception encompasses only cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992). Citing *Ankenbrandt*, the Seventh Circuit has observed that just because a present dispute arises out of a divorce proceeding, "that alone is not enough to trigger [the] exception," which covers "a narrow range of domestic relations issues" involving the granting of divorce, decrees of alimony and child custody orders. *Kowalski v. Boliker*, 893 F.3d 987, 995 (7th Cir. 2018). The Circuit has commented several times on the narrowness of the exception. *Sykes v. Cook Cnty. Cir. Ct. Prob. Div.*, 837 F.3d 736, 741 (7th Cir. 2016); *Storm v. Storm*, 328 F.3d 941, 944 (7th Cir. 2003).

While the Seventh Circuit has previously talked about the "narrow" nature of the domestic relations exception, it also has *expanded* the exception to include a "penumbra" which the Seventh Circuit has described as consisting of "ancillary proceedings…that

state law would require be litigated as a tail to the original domestic relations proceeding." *Friedlander v. Friedlander*, 149 F.3d 739, 740 (7th Cir. 1998); *Storm*, 329 F.3d at 943; *Dragan v. Miller*, 679 F.2d 712, 713 (7th Cir. 1982). *See also Lloyd v. Loeffler*, 694 F.2d 489, 492 (7th Cir. 1982) (asking whether the present dispute would have been handled as an ancillary proceeding to the underlying domestic relations matter). The Seventh Circuit suggests that I approach this question from a "pragmatic" point of view with an eye towards "the policy goals underlying the exception. . . ." *Storm*, 328 F.3d at 944. Those policy goals were fleshed out (and narrowed) by the Supreme Court in *Marshall v. Marshall,* 547 U.S. 293 (2006). Although *Marshall* concerned the probate exception, and not the domestic relations exception, "the two exceptions are materially identical." *Struck v. Cook County Public Guardian*, 508 F.3d 858, 859 (7th Cir. 2007). The Supreme Court concluded that, while the probate exception is narrow, it still "precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Marshall*, 547 U.S. at 311. As the Seventh Circuit pragmatically puts it, a federal court "should not be permitted to elbow its way into a fight" taking place in another court. *Struck*, 508 F.3d at 860.

The question thus becomes whether this case concerns property that is in the custody of a state dissolution court. If it does, then I should defer to that court because "when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Marshall*, 547 U.S. at 311. To answer this question requires an analysis of Indiana civil procedure and the Indiana Supreme Court

7

case of *Fackler v. Powell*, 839 N.E.2d 165 (Ind. 2005). In *Fackler,* the Supreme Court held that the Dissolution Court retains jurisdiction to modify or clarify a property settlement agreement. *Id.* at 167. This jurisdiction includes bringing third parties—in *Fackler*, it was a living trust—into the Dissolution Court even though that third party was not a party to the divorce proceedings. *Id*. at 170.

## Nature of the Claims in this Case

No one can reasonably dispute that once Wilbert and Van Kley relinquished their interest in GJMS, that entity became a marital asset that was part of the marital estate controlled by the Dissolution Court. Put differently, GJMS was a *res* that was under the Dissolution Court's jurisdiction. And indeed, the Dissolution Court judge awarded that asset to Jodi in the Decree of Dissolution. The question, then, is whether my assumption of jurisdiction in this case will intrude on a matter squarely within the bailiwick of the Dissolution Court. In other words, are the claims in this case an effort to "modify" or "clarify" the Dissolution Court's decree. *Fackler*, 839 N.E.2d at 167. If they are, then that issue is within the province of the Dissolution Court. *Id.*

I will first discuss the claims for which I clearly have jurisdiction before turning to the one claim—relating to the payments to Wilbert—which is colorably a matter for the Dissolution Court to address. Most of the claims in this case concern matters that were not before the Dissolution Court and are run of the mill torts that allegedly occurred well after the Decree of Dissolution was entered. First, the declaratory judgment claim in Count I of GJMS's complaint bears no relation to the 2016 Dissolution Court case, as

8

GJMS seeks a ruling concerning a loan of $201,000 that HBI claims it made to GJMS in 2017, well after the divorce decree was entered by the Dissolution Court. [DE 1 at ¶¶22, 25.] Defendants do not argue that the MPSA or the Decree of Dissolution have any bearing on the debt HBI says GJMS owes it. In the words of the Supreme Court in *Marshall*, this loan allegedly made by HBI to GJMS were not a *res* that was under the control of the Dissolution Court. As a result, I clearly have subject matter jurisdiction over Count I.

As for Count II, the theft or conversion claim, it seeks relief for two separate theft schemes. I'll discuss the theft allegations relating to the payments to Wilbert in a moment, but Count II also alleges that the defendants stole money from GJMS and used those funds for services on non-GJMS properties. Just like the loan discussed above which is the subject of Count I, this part of Count II all occurred well after the divorce was finalized and is not referred to in the MPSA. So it cannot be said that this type of after-the-fact misconduct allegedly engaged in by the defendants was in anyway before the Dissolution Court. Put differently, no one needs to seek a modification or clarification of the MPSA to address the purported harm here. *Fackler*, 839 N.E.2d at 167.

Finally, Count III contains similar allegations but in a different legal package. In addition to the claims related to the alleged overpayment to Wilbert, GJMS claims in Count III that all defendants breached their fiduciary duty to GJMS as managers in relation to 1) the loan HBI claims to have made to GJMS; 2) by paying for services not provided to GJMS; and 3) through negligence relating to one of the properties owned by

9

GJMS (the Rochester property). Again, all of these allegations of fiduciary breach are unrelated to the divorce decree; they are alleged torts occurring well after the divorce was finalized and aren't referenced in the MPSA at all. In other words, there would be nothing for the Dissolution Court to clarify. As such, none of these allegations involve a *res* that the Dissolution Court would have jurisdiction to manage. I therefore have subject matter jurisdiction over all of these claims.

But what about the claims relating to the payments made to Wilbert? Both of Counts II and III make allegations that the defendants "stole" money from GJMS by overpaying Wilbert for management fees. But weren't these fees arguably due to Wilbert from GJMS under the MPSA? Recall that the MPSA said that "husband agrees to indemnify and hold harmless Wife and GJMS *from any management fees payable to* Wilbert Hamstra by GJMS after December 31, 2017." [DE 1-1 at page 2, ¶2(A).] What about management fees paid to Wilbert prior to that date? The poorly drafted MPSA is ambiguous about whether Wilbert would be paid prior to that date, and, if so, how much. Thus, the present dispute about that very subject sounds like something the Dissolution Court should clarify since the MPSA was part of that court's decree. *Fackler*, 839 N.E.2d at 167. Put another way, it is "ancillary" to the divorce proceedings. *Friedlander,* 149 F.3d at 740.

But on the other hand, under *Marshall,* GJMS (the *res* in this matter) is no longer under the jurisdiction of the Dissolution Court. And arguably, the payments made to Wilbert after the divorce was finalized were made with funds that were not part of the

10

*res* that was ever under the control of the Dissolution Court. So the exercise of jurisdiction in federal court will not involve me "elbowing my way" into a matter actively before the Dissolution Court. *Struck*, 508 F.3d at 860. On balance, because at the time this case was filed the payments to Wilbert were no longer a *res* that was under the control of the state's Dissolution Court, I will assume jurisdiction over that claim as well. I arrive at the conclusion that retaining jurisdiction is the correct course here, at least in part because of the repeated admonition from the Seventh Circuit as to the narrow nature of the domestic relations exception. *Kowalski*, 893 F.3d at 995; *Sykes*, 837 F.3d at 741; *Storm*, 328 F.3d at 944. But I do so with a substantial degree of uncertainty given the *Fackler* court's admonition that clarifying a divorce decree under Indiana law is a matter for the Dissolution Court. If the evidence at trial ends up suggesting that the claim relating to the payments to Wilbert was part and parcel of the MPSA that was incorporated into the Dissolution Court's decree (meaning it would be a matter for that court to handle), then I will reexamine the issue at that time since policing my own jurisdiction is a perpetual inquiry.

## Conclusion

For all these reasons, I will continue to exercise jurisdiction over this case based on diversity of citizenship.

**SO ORDERED**.

ENTERED: April 11, 2023.   /s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**

11